THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | |
|---|---|
| David Gordon Oppenheimer,<br><br>      Plaintiff,<br><br>    v.<br><br>Event Ticket Sales, LLC and<br>Guinio W. Volpone,<br><br>      Defendants. | Case No. 1:22-cv-02864<br><br>Dist. Judge Andrea R. Wood<br><br>Mag. Judge Sheila M. Finnegan |

## **DECLARATION OF DAVID GORDON OPPENHEIMER**

I, David Gordon Oppenheimer, declare as follows:

1. I have personal knowledge of the following facts and, if called as a witness, I could and would testify as follows:

2. I am the Plaintiff in the above-captioned action, and I make this Declaration in support of my Motion for Partial Summary Judgment against Defendants Event Ticket Sales, LLC ("ETS") and Guinio W. Volpone ("Volpone" and, together with ETS, "Defendants").

3. I worked as a photographer for many years before I became aware of copyright infringements of my works.

4. I first started purchasing film camera equipment in the early 1990s, with the goal of taking professional photographs. I recall first making the effort to work as a concert photographer in 1998, still using film camera equipment.

5. I began to photograph concerts as early as 1998, and I recall actively selling prints and koozies with my photographs in 2002. In the early stages of my business, I also provided some bands with permission to use some photographs as consideration for access to be able to photograph their concerts, including on-stage and backstage, in addition to providing "for hire" photography services.

6. I first created the "Performance Impressions" website in 2002, spending over $2,000 at the time for a simplistic, "starter version" of my website. I formed Performance Impressions LLC as a North Carolina limited liability company on October 7, 2004.

7. I have spent thousands of hours working on the website and marketing my business online and in person, in addition to many more thousands of hours working on photography, logistics, archiving, and scheduling. I also invested thousands of dollars in traveling to create photographs, obtaining applicable insurance coverage, and other operational expenses.

8. Furthermore, in 2004, I started to teach myself HTML coding and took on building up the website and business, while at the same time continuing to develop my craft as a photographer. I proceeded to develop an intellectual property portfolio that I utilized by selling prints and licensing rights for the use of my works. Since then, I worked during the 2008 holiday season as a photographer at the Biltmore Estate. I have also worked with Getty Images on assignment to cover live music events and have been contracted by Getty Images to photograph corporate and commercial events, including the U.S. Olympic Swim Team, Trace Adkins at a Maxwell House Coffee charitable event, and for M&M's Mars.

9. In 2009, while continuing to provide photography services to clients for specific assignments, I also began providing various other marketing services (such as search engine optimization). That same year, I was also the official photographer for David's Bridal in Asheville, and worked as a wedding photographer separate of my relationship with David's Bridal.

10. In the early stage of my photography business, I did not have any significant knowledge about copyright law except a rudimentary "follow-the-leader" basic understanding of adding watermarks to my photographs after seeing other photographers doing so. It was not until November 2009 that I first found an online infringement of one of my works. At that point, I was unaware of the extent of infringements of my works by various businesses. I had not yet filed any applications to register my copyrights in my works. Realizing that to properly protect my works I needed to register my copyrights with the U.S. Copyright Office, I began registering the copyrights of my photographs around January 2010.

11. At that point, registration of copyrights with the U.S. Copyright Office became a common practice for me, and while I still occasionally waited some time after publication to register some works, more often, I began to register works prior to publication. I also started to make it my practice to embed contact information and copyright notices into the metadata of my works, to make it easier for users of the files to identify me as the owner of the photographs, and to be aware of the need to contact me for licensing my works.

12. My first federal complaint to protect the copyright of one of my works was filed was on November 3, 2011, against InYourSpeakers Media, LLC, in the U.S. District Court for the District of Massachusetts.

13. Even after beginning to deal with copyright infringers through litigation, I have continued to actively provide licenses to my works. For example, in 2012 I had several photographs licensed by *Rolling Stone*, MTV, and CNBC. Meanwhile, in 2015 through 2017, via the French licensing agency DALLE, I had my work licensed and featured in French and German publications. In recent years, I have also provided licenses to various businesses, with usage ranging from single-day event use to multi-year limited-print use. I have also sold hundreds of prints of my photography. At the same time, I have continued to contribute my photography for both display and to raise money for various 501(c)(3) charitable organizations, including The Foundation for Photo/Art in Hospitals, Habitat for Humanity, and Meals on Wheels.

14. As I have seen happen time and again over the past decade, businesses and organizations infringe upon my copyrights as well as those of my colleagues. The problem of pirated intellectual property is not just my problem but has become endemic throughout my industry. For example, a March 2019 study has concluded that "of the 3 billion images shared on the internet daily, around 85 percent are used without a valid license." The vast majority of these unpermitted uses occur within the United States. (See Exhibit A of this Declaration, at 2, 5, 9.)

15. When a company infringes on the copyrights of my photographs in the course of doing business, that earns the infringers either direct revenue or ancillary benefits from advertising, affiliate marketing, or other methods. Regardless of the money-making mechanisms or other goals

3

of the infringers, not only did each infringement provide benefits to these companies from their intellectual property theft, but each infringement also facilitated dilution of my works and deprived me of opportunities to earn licensing revenues and grow business relationships.

16. Since 2012, through my company Performance Impressions, I have occasionally hired independent contractors and employees to help me with tasks such as web design, marketing, communications, and cataloging. I have **never** compensated any assistants based on the number of infringements I or anyone else has found.

17. Since beginning my career as a photographer, I have created and made available for licensing over 20,000 photographs. Since around 2013, I have near consistently used an image tracking service to monitor uses of my photographs online, and I supplement it by running my own searches manually. While the third-party software returns a list of potential infringements, I still have to sift through the various results and analyze the results one result at a time to determine which results are actual infringements of my work. In addition to relying on third-party image tracking services, I also sometimes personally search the Internet for my trademarks and copyright-protected works. Because of the number of photographs that I have created and published, it would be extremely hard for me to frequently search every single photograph by myself. As a result, the searches I conduct personally are randomized and not as structured. During manual searches for infringements of my works, I use Google Image search, which matches a photograph with webpages on which Google detects such work being displayed. I also conduct relevant keyword-based image and webpage searches on several search engines to identify unauthorized uses that can cover a broad range of photographs that I have taken.

18. When I identify a potential infringement of my work, I proceed to evaluate whether it is in fact my photograph being used, as well as whether the use is something that is indeed an infringement. I typically log the dates of discovery as having occurred even before I have definitively identified that the use is indeed infringing. If I subsequently identify a particular use as an infringement, I typically send cease-and-desist letters to the infringers either personally or through my attorneys. While I do seek settlement payments to serve as a deterrent for subsequent

4

infringing behavior and as compensation for my work, I also seek to remove infringing uses of my works from the Internet, as such infringing uses serve to perpetuate downstream infringements. In some instances, I forego collecting any settlement proceeds (even if offered some funds by the infringer) as long as (i) the infringer has ensured that the infringing uses have been eliminated; (ii) the infringers donate funds to a mutually acceptable charity; or (iii) the infringers invest in improving internal training procedures relating to sourcing of images. Alternatively, I sometimes request that, in lieu of any payment, unauthorized users of my photographs provide a backlink to my website along with credit and agree to use only the copy of my work with my watermark and metadata intact. In appropriate circumstances, such measures strike a balance between deterring infringing behavior and allowing me to make a living, as my ultimate goal is that my work is properly licensed and that prints of my work are purchased through proper channels.

19. Sometimes I choose to proceed to file suit as a last resort because the infringers either disregard my allegations, refuse to negotiate in good faith, or have continued to infringe. Other times I have been instructed by the infringers or their insurance companies to proceed in filing suit because they are disinclined to execute agreements to toll the statute of limitations or to discuss resolution outside of litigation. Most infringement matters do get resolved, either before or after filing suit, because the unauthorized uses of my photographs are indeed infringing on my rights. I have never commenced a federal copyright action except as a last resort and with guidance, consent, and representation from qualified intellectual property counsel.

20. No court has ever deemed my claims to be frivolous or without merit.

21. In this case, ETS used my photograph of a performance by the Steve Miller Band ("Photograph") without my permission, incorporating the Photograph into webpages on multiple websites owned and operated by ETS, for the purpose of facilitating the promotion of ETS's ticket resale services. I created the Photograph as a credentialed photographer at Biltmore's 16th Annual Concert Series in Asheville, North Carolina.

22. ETS's websites containing my Photograph did not show the extensive metadata and copyright notices that were embedded in my Photograph. The Photograph was also selectively

cropped, removing the portion with the watermark that contained my copyright notice. These factors made it more difficult for any image tracking service or me to locate and identify the infringing use of the Photograph on the websites.

23. In 2017, I switched to using the image tracking service Pixsy. I imported the Photograph into Pixsy on December 28, 2017, as part of a bulk import. Pixsy was named the "Best Online Image Protection Platform" in the Technology Elite Awards 2019 by US Business News (now branded as New World Report). (See Exhibit C of this Declaration.) As one of the attached screenshots shows, Pixsy first returned a result of ETS's uses of the Photograph on June 1, 2019. (See Exhibit B of this Declaration.)

24. While Pixsy logged ETS's usages of the Photograph on June 1, 2019, I did not see and/or process this information until June 8, 2019. I know this, because when I personally begin investigating a potential infringement, I create a digital folder to compile evidence and other relevant information pertaining to the potential infringement. As set forth in the attached screenshot of the details of such digital folder, the digital folder was created on June 8, 2019. (See Exhibit D of this Declaration.)

25. After creating a digital folder for ETS's uses of the Photograph, I still had to conduct additional due diligence to determine whether the uses may have been previously authorized by contract or by law. This included taking the time to confirm in my records whether the Photograph had been licensed previously, and to consult with my attorney whether any potential defenses to infringement may apply. I did not decide to pursue ETS's unauthorized uses until I had determined in good faith that they were infringing uses. Therefore, my determination that ETS's uses were in fact infringing occurred at some point between June 1, 2019, and August 23, 2021, when one of my attorneys sent a cease-and-desist letter to ETS. Nevertheless, my practice is to log the "date of discovery" as having occurred prior to my determination that the use is infringing. To ensure the timeliness of any potential suit, I treated June 1, 2019, as the date on which I "discovered the infringing use," because that was the date when Pixsy first logged ETS's uses of the Photograph.

26. The cease-and-desist letter notified ETS of the unauthorized uses of my Photograph on ETS's websites. While ETS acknowledged receipt of my attorney's letter, to my knowledge, ETS made no meaningful effort to have the Photograph removed from the websites upon receipt of that initial letter. Instead, ETS responded by doubling down on its right to use the Photograph by claiming that the Photograph was not protectible. (*See* Dkt. 22-7.) My attorney sent yet another letter explaining in more detail why ETS's position was unreasonable. ETS did not respond to this second letter. While ETS removed the Photograph from one of the webpages, the Photograph remained displayed at other URLs as a result of ETS's actions. ETS also did not make any offer to compensate me for its commercial displays of the Photograph. My attorney followed up again with ETS's attorneys in April 2022, asking whether ETS would be willing to resume communications in an effort to resolve the dispute without litigation. ETS did not respond.

27. ETS has expressed a cavalier attitude toward copyright infringement. Without any indication from ETS of intent to settle the case on reasonable terms, I instructed my attorneys to file this case before the three-year anniversary of Pixsy's initial identification of the Photograph on ETS's websites.

28. Prior to my discovery of Defendants' infringements of my work, to the best of my knowledge, my rights in the Photograph had not been infringed by anyone. According to results from Pixsy that I accessed on July 7, 2023, the Photograph has not been infringed upon by anyone other than ETS. This is after thirty-one separate searches conducted by Pixsy from around December 28, 2017, through May 11, 2023. During that period, Pixsy has identified only a single match of the Photograph, stemming from ETS's usages. (See Exhibit E of this Declaration.) Because I only published the Photograph with copyright management information (as discussed above), this leads me to conclude that ETS could not have obtained a version of the Photograph without my CMI on it. The subsequent publication of the Photograph by ETS without my CMI necessarily would have required ETS or agents of ETS to have removed the CMI from the Photograph before using the Photograph on multiple websites.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this <u>10th</u>day of <u>    July         </u>, 2023, at Asheville, North Carolina.

_____
DAVID G. OPPENHEIMER